IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED
M. 5-24 2011
DAVID J. MALAND, CLERK
U.S. DISTRICT COURT
By_____
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 1:09-CR-175(10) |
| | § | |
| MARCO ANTONIO VILLAREAL | § | |

## FACTUAL BASIS AND STIPULATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorney in and for the Eastern District of Texas, joined by **Marco Antonio Villareal,** defendant, and his counsel of record, Alfred Flores, Jr., and presents this factual basis and stipulation in support of the defendant's plea of guilty to Count One of the second superseding indictment filed herein, and, in support thereof, would show the following:

1. That **Marco Antonio Villareal**, defendant, hereby stipulates and agrees as to the facts recited in paragraph 5. Defendant stipulates and agrees to the truth of all matters set forth in these paragraphs in this factual basis and stipulation, and agrees that such admission may be used by the Court in support of his plea of guilty to Count One of the second superseding indictment, alleging a violation of 21 U.S.C. § 846, conspiracy to distribute and to possess with intent to distribute five (5) kilograms or more of a Schedule II controlled substance, namely: cocaine HCL.

2. That the defendant, who is pleading guilty to such second superseding indictment, is one and the same person charged in the second superseding indictment.

3. That the crime alleged in the second superseding indictment occurred on or about the dates and places specified in the second superseding indictment;

4. That the events described in the second superseding indictment occurred in the Eastern District of Texas and elsewhere;

5. That, had this case proceeded to trial, the government would have proven each and every essential element of the offense, beyond a reasonable doubt, through the testimony of witnesses, including expert witnesses, and through exhibits, which would have demonstrated the following:

<u>Over view of the criminal scheme</u>:

As to Count One:

a) Beginning in the 1990s, the exact date being unknown, Edward Longoria and his brother-in-law, Lorenzo Espinosa began to distribute cocaine HCL to mid level drug traffickers in the Houston Texas area, to include Joe Garcia. Though both Longoria and Espinosa originally served as drug and money couriers for others, they advanced in the drug trade and ultimately became large scale distributors of cocaine HCL in their own right.

b) Once Espinosa and Longoria had achieved sufficient status with Mexican sources of cocaine HCL, they began to receive regular multi-kilogram shipments of cocaine HCL from those sources of supply. That cocaine, once smuggled across the Rio Grande river in southern Texas, was then transported by various means to stash house distribution points in and around the Houston, Texas area.

c) Espinosa and Longoria distributed these multi-kilogram loads to both local customers and co-conspirators located in other states of the United States with the assistance of couriers such as Alvaro Soto and Marco Antonio Villareal. Soto, Villareal and others worked at the direction of Espinosa and Longoria and received, stored and delivered cocaine HCL in bulk to local distributors such as

Warren Randle (and others) and remote customers such as Xavier Gray (and others).

d) Local distribution was achieved via the use of cellular telephones and various vehicles. When local customers were in need of cocaine HCL they typically would contact Longoria via cellular telephone. If price negotiation was necessary, Longoria would contact Espinosa via cellular telephone to confer and confirm the then current wholesale price of cocaine HCL per kilogram being sought by the Espinosa-Longoria drug trafficking organization (DTO). Once an agreed upon price had been reached between DTO and local customer, Longoria would coordinate with couriers such as Soto and Villareal to meet with the customer for delivery of the cocaine HCL purchased.

e) Couriers, once contacted would go to a location where they could meet the local customer without drawing attention from law enforcement. Sometimes these locations were in residential areas on side streets. And at other times rural locations associated with Espinosa and Longoria's cover waste management business were employed.

f) The monies generated by the local distribution of cocaine HCL by the Espinosa-Longoria DTO were regularly returned by distributors to Longoria in person, again through the coordinated use of cellular phones and various vehicles.

g) The Espinosa-Longoria DTO achieved the multi-state distribution of cocaine HCL with the help of a series of CDL commercial truck drivers. In this part of the scheme, the DTO would arrange delivery of multi-kilogram amounts of cocaine HCL via couriers (such as Soto and Villareal) to truck drivers such as Abraham Woods, Terence Young, Lawrence Wilson, Lawrence Ballard and Frank Young. Those drivers would then transport those multi-kilogram loads of cocaine HCL to locations across the eastern United States via the Eastern District of Texas.

h) The Espinosa-Longoria DTO sent multi-kilogram loads of cocaine HCL to Jackson, MS, Atlanta, GA, Columbus, OH, New Orleans, LA, Nashville, TN and Philadelphia, PA (and other destinations). The same truck drivers who transported the cocaine HCL shipments to these cities would, in turn, return the bulk cash money shipments derived from the sale of that contraband to the Espinosa-Longoria DTO in Houston, TX via the Eastern District of Texas.

i) The large amounts of tainted funds generated by the criminal scheme were transported back to Mexico and elsewhere via bulk shipments of United States funds secreted in hidden compartments and voids in automobiles and also by body carriers. These funds were transported by couriers who had knowledge of the

illicit nature of the currency transported. Those couriers were employed by the scheme's principals to transport those bulk shipments of cash in order to avoid applicable reporting requirements and to conceal their ownership. Those couriers were also aware that the funds were intended to both repay drug debts and to be returned to general circulation after being used to purchase legitimate goods by individuals who had no legitimate sources of income.

j) The Espinosa-Longoria DTO utilized the services of an accountant, Mindy Kay McGilvrey, to launder and conceal the proceeds of their criminal enterprise. To that end McGilvrey would: i) complete tax returns for Espinosa and Longoria (and other members of the scheme) that did not accurately reflect the income level/life style that McGilvrey was personally aware that Espinosa and Longoria enjoyed; ii) received, on some occasions, bulk cash lots of hundreds of thousands of United States dollars from both Espinosa and Longoria that had been derived from narcotics transactions. McGilvery then converted those tainted funds into financial instruments for the nominally legitimate purchase of real property. McGilvrey also established shell corporations for the purpose of shielding the Espinosa-Longoria DTO's unlawful activities from scrutiny behind an apparently legitimate corporate veil.

k) Law enforcement agencies became aware of the activities of sub-components of the scheme in the 1990s and from that time forward, an increasing number of seizures began to be made by those investigators of both drugs and tainted funds, to include:

|    | Date       | Location        | Co-conspirator                                                          | Seized items                              |
|----|------------|-----------------|-------------------------------------------------------------------------|-------------------------------------------|
| 1) | 10/4/2006  | Nacogdoches, TX | E. LONGORIA<br>L. ESPINOSA<br>D. COREATHERS<br>K. STARKS<br>A. SOTO<br>A. WOODS | 48 kilos<br>Cocaine HCL                   |
| 2) | 12/15/2008 | Nashville, TN   | X. GRAY<br>A. SOTO<br>E. LONGORIA<br>D. ESPINOSA<br>L. WILSON<br>E. EMERSON<br>A. WOODS<br>L. BALLARD | 19 kilos<br>Cocaine HCL<br>$255,746.00 |

|    | Date       | Location        | Co-conspirator                                                          | Seized items                          |
|----|------------|-----------------|-------------------------------------------------------------------------|---------------------------------------|
| 3) | 12/19/2008 | Vinton, LA      | L. WILSON<br>F. YOUNG<br>A. SOTO                                        | 8 kilos<br>Cocaine HCL                |
| 4) | 4/9/2009   | Beaumont, TX    | A. WOODS<br>T. YOUNG                                                    | 663 lbs. MJ                           |
| 5) | 5/1/2009   | Jackson, MS     | J. WILLIAMS<br>F. YOUNG                                                 | 25 kilos<br>Cocaine HCL               |
| 6) | 6/27/2009  | Philadelphia, PA | L. ESPINOSA<br>E. LONGORIA<br>K. STARKS<br>E. EMERSON<br>T. GILMORE<br>L. WOODARD | 4 kilos<br>Cocaine HCL<br>$111,403.00 |
| 7) | 5/18/2010  | Jackson, MS     | F. YOUNG<br>A. SOTO<br>J. WILLIAMS<br>F. FRANKLIN                       | $168,000.00                           |
| 8) | 6/26/2010  | Beaumont, TX    | L. ESPINOSA<br>E. LONGORIA<br>K. STARKS<br>L. BALLARD<br>M. VILLARREAL  | 28 kilos<br>Cocaine HCL               |

l) Properly qualified laboratory technicians would have testified that the contraband seized during the period of the defendant's criminal episode was cocaine HCL and marijuana, in the amounts indicated in paragraph 5(k) above.

## As to **Marco Antonio Villareal's** role in the conspiracy:

m) **Marco Antonio Villareal's** (defendant's) association with the Espinosa-Longoria DTO began at the inception of that scheme. It continued until his arrest in 2011;

n) During the period of his active involvement in the scheme, the defendant was a drug courier/money courier for the Espinosa-Longoria DTO's cocaine HCL. In that guise the defendant was directed by Edward Longoria and Lorenzo Espinosa to meet with the DTO's local customers and truck drivers to both deliver multi-kilogram loads of cocaine HCL to them and to receive, on some occasions, tainted funds derived from the sale of the DTO's cocaine kilograms. These funds were, in turn, delivered to the defendant's superiors in the scheme;

o) Law enforcement investigators employed court authorized interceptions of certain of the cellular phones used by the Espinosa-Longoria DTO during the investigation of that scheme. The defendant was recorded on numerous occasions discussing narcotics transactions with his superiors in the scheme. During one such period of interception, the defendant and others were intercepted discussing a soon to be shipped multi-kilogram load of cocaine HCL that the DTO was going to send to Louisiana and Georgia. As a direct result of these wire interceptions, law enforcement officers observed the defendant delivering a multi-kilogram load of cocaine HCL to Lawrence Ballard. After that delivery, Ballard was observed loading that contraband in his semi-truck. Ballard was then observed driving that semi-truck from Houston to the Eastern District of Texas. Once in Beaumont, Texas, Ballard, Eastern District of Texas was stopped on IH-10 by law enforcement and found to be in possession of twenty-eight (28) kilograms of cocaine HCL;

p) During the period of time of his active involvement in the scheme, the defendant agrees and the parties stipulate that he was directly associated with the distribution of between fifty (50) and one-hundred-fifty (150) kilograms of cocaine HCL;

## DEFENDANT'S SIGNATURE AND ACKNOWLEDGMENT

6. I have read this factual basis and stipulation and the second superseding indictment or have had them read to me and have discussed them with my attorney. I fully understand the contents of this factual basis and stipulation and agree without reservation that the United States can prove each of these acts and that it accurately describes the

events about my acts and the events as recited as I know them.

Dated: 5-23-11

Marco Antonio Villareal
Defendant

### DEFENSE COUNSEL'S SIGNATURE AND ACKNOWLEDGMENT

7. I have read this factual basis and stipulation and the second superseding indictment and have reviewed them with my client, **Marco Antonio Villareal**. Based upon my discussions with the defendant, I am satisfied that the defendant understands the factual basis and stipulation as well as the second superseding indictment, and is knowingly and voluntarily agreeing to these stipulated facts.

Dated: 5/23/11

Alfred Flores, Jr.
Attorney for the Defendant

Respectfully submitted,

JOHN M. BALES
UNITED STATES ATTORNEY

for John A. Craft
ASSISTANT UNITED STATES ATTORNEY